NOT FOR PUBLICATION

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| CHRISTINE PETRE, | : |
| Plaintiff, | : |
| | : Civil No. 20-09002 (RBK/AMD) |
| v. | : |
| | : **OPINION** |
| ALLIANCE HEALTHCARE MANAGEMENT, LLC, et al., | : |
| Defendants. | : |

**KUGLER**, United States District Judge:

Presently before the Court is Defendant's Motion to Dismiss (Doc. No. 10) the Complaint for failure to state a claim pursuant to Rule 12(b)(6). For the reasons set forth below, Defendant's Motion is **GRANTED**.

**I.   BACKGROUND**

This is a retaliatory discharge case. A former employee of a skilled nursing home alleges she was discharged for refusing to engage in what she believed to be fraud. Defendants, seeking dismissal of the Complaint, also believe they have spotted something amiss—an erroneous allegation in the complaint which they hope, if tugged on, will unravel the whole case. Both parties are wrong, but Defendants less so because they manage to pick out the deficiency in Plaintiff's complaint.

Before setting forth the relevant facts, we will briefly introduce the Medicare Statute and the Medicare Secondary Payer provision as both are relevant to Plaintiff's theory of the case.

**A.   Statutory and Regulatory Background**

1

Subchapter XVIII of Chapter 7 of Title 42 of the United States Code is entitled "Health Insurance for Aged and Disabled," and is more commonly known as the Medicare Statute. 42 U.S.C. § 1395 to 1395kkk-1. The Medicare Statute consists of four tranches of benefits: (1) Part A provides inpatient and hospital coverage; (2) Part B provides outpatient and medical coverage; (3) Part C, inserted with the passage of the Balanced Budget Act of 1997, created the Medicare Advantage Program ("MA"); and (4) Part D provides prescription drug coverage. *In re Avandia Mktg., Sales Practices & Prod. Liab. Litig.*, 685 F.3d 353, 357 (3d Cir. 2012). Part A and B, commonly thought of as traditional Medicare, are fee-for-service provisions entitling eligible persons to have the Center for Medicare and Medicaid Services ("CMS") directly pay medical providers for their hospital and outpatient care. *Id.*

Part C, on the other hand, allows Medicare enrollees to obtain their Medicare benefits through private insurers, known as Medicare Advantage Organizations ("MAOs"), instead of receiving direct benefits from the government under Part A and B. *Id.* CMS pays an MAO a fixed amount for each enrollee, per capita. *See* 42 U.S.C. § 1395w-23. The MAO then administers Medicare benefits for those enrollees and assumes the risk associated with insuring them. *In re Avandia Mktg., Sales Practices & Prod. Liab. Litig.*, 685 F.3d at 358. MAOs are therefore responsible for paying covered medical expenses for their enrollees. *Id.* Part C allows MAOs some flexibility as to the design of their MA programs. For instance, the MAO is required to provide the benefits covered under Parts A and B to enrollees, but it may also provide additional benefits to its enrollees. 42 U.S.C. § 1395w-22(a)(1)–(3).

The Medicare Secondary Payer ("MSP") provision, enacted in 1980 to curb skyrocketing health costs and lower Medicare disbursements, is also relevant to Plaintiff's theory of the case. The MSP provision curbs health care costs and preserves Medicare's fiscal integrity by assigning

primary payment responsibility to private insurance plans in situations where private coverage for healthcare costs is available to a Medicare recipient. *Abate v. Wal-Mart Stores E., L.P.*, No. 1:17-CV-288-SPB, 2020 WL 7027481, at *8 (W.D. Pa. Nov. 30, 2020). In other words, the MSP provision is implicated where a beneficiary is covered by both Medicare and private insurance. "These private plans are therefore considered 'primary' under the MSP provision and Medicare acts as a secondary payer responsible only for paying amounts not covered by the primary plan." *Id.* The provision provides in pertinent part that Medicare cannot pay medical expenses where "payment has been made or can reasonably be expected to be made" by a primary plan. *Fanning v. United States*, 346 F.3d 386, 389 (3d Cir. 2003). A "primary plan" is defined, in turn, as a group health plan, large group health plan, a workmen's compensation law or plan, an automobile or liability insurance policy or plan (including a self-insured plan), or no-fault insurance. 42 U.S.C. § 1395y(b)(2)(A)(ii).

The cost-shifting provision of the MSP provision works as follows: when a Medicare recipient is covered by both private insurance and Medicare, and such private insurance falls within the definition of a "primary plan," the private insurance is the primary payer for medical expenses and Medicare acts as the secondary payer responsible only for those amounts not covered by the private insurance. Thus, a prerequisite to application of the MSP provision is a private insurance plan that qualifies as a "primary plan."

### B. Factual Background

In October of 2019, Plaintiff Christine Petre ("Ms. Petre") was employed as a clinical liaison by Defendant Atlas Healthcare—the owner of several nursing homes located throughout New Jersey. (Doc. No. 1, Compl. at ¶¶ 5, 13). She was primarily responsible for coordinating the care and placement of patients in facilities owned by Defendant, such as Riverfront

3

Rehabilitation and Health Care Center ("RRHCC"), as well as ensuring that beds were available and that prospective patients had insurance coverage. (*Id.* at ¶¶ 5, 13–14). Throughout her employment, Ms. Petre was directly or indirectly supervised by the Regional Admissions Director—Defendant Estefanny Penafiel ("Defendant Penafiel")—and the co-owners, Defendants Phillip Bak and Sam Goldberger. (*Id.* at ¶ 20).

Beginning in mid-March 2020, the start of the pandemic, Defendants allegedly capitalized on the increase in demand for nursing home beds by expanding a fraudulent scheme to disenroll prospective patients from private health insurance and enroll them in Medicare. (*Id.* at ¶ 17). Defendants allegedly: (1) discriminated against patients that did not have Medicare; (2) misrepresented to prospective patients, social workers, and hospital case managers that beds were not available if the prospective patients did not have Medicare; and (3) directed Ms. Petre to try to "convince prospective patients . . . to disenroll from their then applicable . . . health insurance . . . and to only use Medicare" during their stay at the nursing home. (*Id.* at ¶ 21). Medicare coverage was advantageous to Defendants because they would receive a direct fee for services ranging from $600 to $800 under traditional Medicare but only $200 to $400 under private insurance plans. (*Id.* at ¶ 35(C)). Therefore, Defendants had a financial incentive to maximize the number of patients that were covered by Medicare and would make "any representation possible" even though the representations were often "false or misleading." (*Id.* at ¶ 35(P), (R)(ii)). Defendants also failed to disclose to Medicare that the patients they were disenrolling had primary payer insurance which was allegedly Medicare Advantage. (*Id.* at ¶¶ 35(R)(iii), (C)).

In order to perpetuate this alleged disenrollment scheme, Ms. Petre was instructed by Defendant Penafiel to convince prospective patients to disenroll from private insurance and

4

enroll in Medicare. (*Id.* at ¶ 29). It was indicated to Ms. Petre that this instruction came from the owners "Sam and Phil." (*Id.*). Even though she expressly stated that she would not try to convince patients to disenroll from private insurance, believed the practice was illegal, and was uncomfortable with it, she was told, "Christine you can't say no." (*Id.*). On one occasion, Defendant Penafiel texted Ms. Petre the following:

> Defendant Penafiel: All your saying is hey we just received the referral for your family member and we're trying to accommodate if we have a bed. We also want to give you the option to disenroll your family member to start Medicare during our stay so the co-pay will be waived from your HMO if you choose to go that route.
>
> Defendant Penafiel: Yes, we could always put the patient back in whatever plan they had when they go back to the community if family wants that
>
> Defendant Penafiel: that's all you have to say and if they say yes then yes if not then we go from there and we deny.

(*Id.* at ¶ 30). At some point, she also informed management that she believed Defendants actions to be "fraudulent" and a form of "fraud." (*Id.* at ¶ 37).

In addition to this allegedly fraudulent disenrollment practice, Defendants' allegedly drained Medicare through a coinsurance scheme. Once a patient switched to Medicare, they became responsible to pay a coinsurance of $176 per day for any day after the first 21 days they were admitted in the nursing home. (*Id.* at ¶ 35(S)). Defendants allegedly told these patients to "disenroll and not to worry about the $176 payment [because] . . . Defendant would just write off the coinsurance not making patients pay." (*Id.* at ¶ 35(S)(i)). In reality, however, Defendants knew that under Medicare regulations, after they wrote three letters seeking payments from the patient, if a payment plan was not made, Defendants would receive 50% of the defaulted coinsurance from Medicare. (*Id.*).

After about six months on the job, Ms. Petre was informed by Defendant Penafiel that ownership was "pissed" at her and recommended she "get on board" with disenrollment. (*Id.* at ¶

5

36). She was also told that as of April 30, if she would not participate in disenrollment, she would need to resign. (*Id.*). She refused to resign and continued to work. (*Id.* at ¶ 37). By May 4, 2020, Ms. Petre was informed by Defendant Bak that her position no longer existed and was thereafter locked out of her email. (*Id.* at ¶ 38). Ms. Petre received a letter dated "effective 5/5/2020" which stated "[w]e understand that you are not willing to perform the responsibilities of the position assigned of you at this time. We reluctantly accept your resignation." (*Id.* at ¶ 39). Following receipt of the letter, Ms. Petre responded via email to all Defendants stating, among other things, that:

> I did not resign. . . . I believe may abrupt layoff was in retaliation to my unwillingness to disenroll patients from their medical insurance so they could instead admit to Atlas facilities under their Medicare benefits. My continual stating of my not being comfortable using a patient's willingness to disenroll from their insurance as a top criteria that the company was using when assessing a patient referral was met with anger and annoyance from leadership. I made it clear that I found this practice to be unethical, potentially fraudulent, and most likely not in the best interest of the patients in regards to their medical coverage following their stay at an Atlas facility.

(*Id.* at ¶ 40).

### C. Procedural History

On June 19, 2020, Plaintiff brought a retaliatory discharge action against the Defendants in state court for violation of New Jersey's Conscientious Employee Protection Act ("CEPA"), the ant-retaliation provision of the False Claims Act ("FCA"), and for wrongful discharge in violation of public policy. (Doc. No. 1). Defendants removed the case to federal court on July 16, 2020, and then moved to dismiss the complaint on August 6. (Doc. No. 10).

## II. LEGAL STANDARD

### A. Motion to Dismiss

Federal Rule of Civil Procedure 12(b)(6) allows a court to dismiss an action for failure to state a claim upon which relief can be granted. When evaluating a motion to dismiss, "courts

6

accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (quoting *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)). In other words, a complaint survives a motion to dismiss if it contains enough factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

To make this determination, courts conduct a three-part analysis. *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010). First, the Court must "tak[e] note of the elements a plaintiff must plead to state a claim." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)). Second, the Court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* (quoting *Iqbal*, 556 U.S. at 680). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (quoting *Iqbal*, 556 U.S. at 678). Finally, "when there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." *Id.* (quoting *Iqbal*, 556 U.S. at 679). A complaint cannot survive a motion to dismiss where a court can only infer that a claim is merely possible rather than plausible. *Id.*

### III. DISCUSSION

#### A. False Claims Act

Plaintiff claims Defendants violated § 3730(h)(1) when they fired her for refusing to engage in the allegedly fraudulent disenrollment scheme. Her theory is that the disenrollment scheme caused an economic loss to the federal government because the private plans were often

primary payers under the Medicare Secondary Payer statute while Medicare was the secondary payer, covering only excluded costs. Therefore, by disenrolling prospective patients from private insurance plans and enrolling them in Medicare, Defendants caused the government to become a primary payer thereby covering more medical expenses than it otherwise would have as a secondary payer. Defendants attack her underlying theory and latch on to her allegation in the complaint that the "private insurance plans" patients were disenrolled from was Medicare Advantage. According to Defendants, Plaintiff's theory is incorrect as a matter of law because switching between Medicare Advantage and traditional Medicare is not a violation of the Medicare Secondary Payer provision as Medicare Advantage plans are not "primary plans" under 42 U.S.C. § 1395y(b)(2)(A)(ii). Therefore, Defendants argue that Plaintiff's retaliation claim must be dismissed because there is not a distinct possibility that a *viable* FCA action could be filed.

> Section 3730(h)(1) of the False Claims Act provides:
>
> Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

31 U.S.C. § 3730(h)(1). To prove retaliation under the FCA, a plaintiff must show (1) that he engaged in protected conduct (i.e., acts done in furtherance of an action under § 3730), and (2) that he was discriminated against because of his protected conduct. *DiFiore v. CSL Behring, LLC*, 879 F.3d 71, 76 (3d Cir. 2018).

In addressing what activities constitute "protected conduct," the "case law indicates that 'protected [conduct]' requires a nexus with the in furtherance of 'prong of [a False Claims Act] action.'" *Hutchins v. Wilentz, Goldman & Spitzer*, 253 F.3d 176, 187 (3d Cir. 2001). This inquiry

8

involves determining "whether [plaintiff's] actions sufficiently furthered 'an action filed or to be filed under' the [False Claims Act] and, thus, equate to 'protected [conduct].'" *Id.* Because conduct is protected if taken in furtherance of an action "filed or *to be filed*," employees need not actually file a False Claims Act suit to assert a cause of action under § 3730. *Dookeran v. Mercy Hosp. of Pittsburgh*, 281 F.3d 105, 108 (3d Cir. 2002). Nor are employees required to develop a winning FCA case to be afforded whistleblower protection. *Id.* Rather, courts require that there be a distinct possibility that a viable FCA action could be filed. *Id.*; *see Dookeran v. Mercy Hosp. of Pittsburgh*, 281 F.3d 105, 108 (3d Cir. 2002) (granting summary judgment in favor of defendants on the section 3730(h)(1) retaliation claim because there was not a distinct possibility that a viable FCA action could be filed since no "claim" had been made on the government within the meaning of section 3729).

Defendants' argument is legally correct but factually inaccurate. While we agree with Defendants that switching Medicare Advantage to Medicare is not a violation of the MSP provision,[1] Plaintiff alleges more than just the disenrollment scheme. Therefore, unlike

---

[1] Plaintiff alleges, in pertinent part, that Defendants violated the False Claims Act by directing her to convince prospective in-patient applicants to disenroll from a private insurance plan when that insurance plan was the "primary payer," and Medicare was the secondary payer. (*Id.* at ¶¶ 25–28). The net result of this scheme, according to Plaintiff, is an economic loss to the federal government because it is covering all medical costs as the primary payer instead of the excluded costs it would have covered as a secondary payer. (*Id.*). Plaintiff's theory hinges on the assumption that applicants were disenrolled from insurance plans that constitute "primary plans" under 42 U.S.C. § 1395y(b)(2)(A)(ii). In other words, this theory makes sense only if the private insurance plans were actually "primary plans" under the MSP statute because by failing to disclose "primary plan" status, Defendants are making Medicare pay more than it otherwise would have as a secondary payor. However, as alleged, Plaintiff's theory fails because Medicare Advantage is not a primary plan within the meaning of 42 U.S.C. § 1395y(b)(2)(A)(ii); that is Medicare Advantage is not a group health plan, large group health plan, a workmen's compensation law or plan, an automobile or liability insurance policy or plan (including a self-insured plan), or no-fault insurance. Indeed, the cases are legion which show that Medicare Advantage Organizations are not primary payers but secondary. For instance, both the Third and Eleventh Circuits have concluded that an MAO may sue a primary payer under the MSP private cause of action when the "primary plan . . . fails to provide primary payment." *Humana Med. Plan, Inc. v. W. Heritage Ins. Co.,* 832 F.3d 1229, 1236 (11th Cir. 2016); *In re Avandia Mktg., Sales Practices & Prod. Liab. Litig.*, 685 F.3d 353, 357 (3d Cir. 2012). Logically, if the MAO is suing the primary plan for failure to provide the primary payment, the MAO could not be the primary plan. *See Humana Med. Plan, Inc. v. W. Heritage Ins. Co.,* 832 F.3d 1229, 1236 (11th Cir. 2016) (explaining the operation of § 1395y(b)(2)(A) which "defines 'primary plan' and bars any Medicare payment—including an MAO payment—when there is a primary plan.").

Defendants, we are not certain that Plaintiff would be precluded from showing there is a distinct possibility that a *viable* FCA action could be filed. *U.S. ex rel. Drescher v. Highmark, Inc*., 305 F. Supp. 2d 451, 457 (E.D. Pa. 2004) (noting that because the Supreme Court has held that the FCA "is intended to reach all types of fraud, without qualification, that might result in financial loss to the Government" and "reaches beyond 'claims' which might be legally enforced, to all fraudulent attempts to cause the Government to pay out sums of money," the term "false or fraudulent claim" should be construed broadly). Nevertheless, we need not and *do not decide* this issue because we agree with Defendants' second point—Plaintiff has failed to adequately allege that she engaged in "protected conduct" and that Defendants were on notice of her "protected conduct."

"Protected conduct" includes "investigation for, initiating of, testimony for, or assistance in" an FCA suit. *Hutchins v. Wilentz, Goldman & Spitzer,* 253 F.3d 176, 186 (3d Cir.2001); 31 U.S.C. § 3730(h). It also encompasses internal reports of FCA violations. *Hutchins*, 253 F.3d at 187. Protected activity does not, however, include "an employee's investigation of nothing more than his employer's non-compliance with federal or state regulations." *Id*. at 187–88.

Once a plaintiff has shown that he was engaged in "protected conduct," he must show that he was discriminated "because of" his "protected conduct." *Hutchins*, 253 F.3d at 188. "To meet this requirement, a plaintiff must show his employer had knowledge that he was engaged in 'protected conduct' and that the employer retaliated against him because of that conduct." *Id.* The Third Circuit has adopted the holding of several other courts of appeals that "the knowledge prong of § 3730 liability requires the employee to put his employer on notice of the 'distinct possibility' of [FCA] litigation." *Id.* This notice of a "distinct possibility" of FCA litigation "is essential because without knowledge an employee is contemplating a False Claims Act suit,

'there would be no basis to conclude that the employer harbored § 3730(h)'s prohibited motivation, i.e., retaliation.'" *Id.* (citing *Mann v. Olsten Certified Healthcare Corp.*, 49 F.Supp.2d 1307, 1314 (M.D.Ala.1999)). An employer may be on notice of such a "distinct possibility" of litigation "when an employee takes actions revealing the intent to report or assist the government in the investigation of a [FCA] violation." *Hutchins*, 253 F.3d at 189; *see also id.* at 188 n.8 (noting that while "the 'protected conduct' and notice requirements are separate elements of a prima facie case of retaliation under § 3730 ... the inquiry into these elements involves a similar analytical and factual investigation.").

For instance, we dismissed a section 3730(h) retaliation claim because the plaintiffs never connected their complaints of wrongful activity with fraud on the government. *U.S., ex rel. LaPorte v. Premier Educ. Grp.*, *L.P.*, No. CIV. 11-3523 RBK/AMD, 2014 WL 5449745, at *13 (D.N.J. Oct. 27, 2014). Plaintiffs Amaya and Moody worked in an administrative capacity for the Harris School of Business and alleged that Premier Education Group ("PEG"), the owner of the Harris School of Business, made false claims in order to participate in Federal student aid financial aid programs. *Id.* at *1. They claimed that PEG falsified student records in order to receive more program funding than they were eligible to receive by changing grades from failing to passing, falsifying attendance records of students who were no longer in attendance, and falsifying financial aid records. *Id.* at *2. After the plaintiffs were fired, they brought retaliation claims under section 3730(h) arguing that they were terminated for engaging in "protected conduct." *Id.* at *11. They claimed that the letters they wrote to the vice president of PEG informing him of misconduct, including improper grade changes, advancing unqualified students, and failure to dismiss students not meeting the satisfactory academic progress standard, constituted "protected conduct." *Id.* at *12. We held that the plaintiffs had not adequately alleged

11

they engaged in protected conduct because there was no suggestion that "they were investigating, initiating, testifying for, or assisting with a FCA action when they alerted" the vice president to the alleged wrongdoing. *Id.* at *13. Likewise, they did not allege that they mentioned a pending or future FCA action or threatened to report PEG's activities to the government. *Id.* Therefore, we dismissed the plaintiffs' retaliation claim because they failed to connect the wrongful activity complained of with fraud on the government. *Id.*

As alleged, Plaintiff has failed to show that she engaged in "protected conduct." Of all the allegations in the Complaint, only two can be construed as "protected conduct": (1) Plaintiff expressly stated that she believed the disenrollment scheme to be illegal (Doc. No. 1, Cmpl. at ¶ 9); and (2) Plaintiff expressly stated to management that she believed "[d]efendants' actions and directives to be 'fraudulent' and a form of 'fraud.'" (*Id.* at ¶ 9). Just like the plaintiffs in *LaPorte*, Plaintiff does not connect her reports of wrongful conduct with fraud on the government. Nowhere does Plaintiff allege that she "was investigating, initiating, testifying for, or assisting with a FCA action" when she alerted Defendants of their allegedly fraudulent conduct. Nor does she even remotely suggest that she might initiate an FCA action or report Defendants' wrongful conduct to the government. She merely uses the word "fraud" which is not enough. *Quint v. Thar Process, Inc.*, No. CIV.A. 11-116, 2011 WL 4345925, at *15 (W.D. Pa. Sept. 15, 2011) (dismissing an employee's FCA retaliation claim even though he told his employer that its actions were fraudulent because an employee's investigation of what he believes to be non-compliance with the law in insufficient); *Campion v. Ne. Utilities*, 598 F. Supp. 2d 638, 658 (M.D. Pa. 2009) (dismissing a section 3730(h) retaliation claim even though the employee reported his concern about mischarging the government to his employer because he did not inform his supervisor that he was concerned the misconduct would cause the government to lose

funds or that he might report the activities to the government). Therefore, as alleged, Plaintiff has failed to state a claim for retaliation under § 3730(h).

Plaintiff's argument to the contrary, that Defendants were aware she was going to report them for fraud because they threatened to terminate her, is not supported by the Complaint. Plaintiff's argument is based on the following quote:

> [b]y the end of April 2020, Plaintiff was informed by Defendant Penafiel that ownership (referencing Defendant Bak) was 'pissed' at her and that Plaintiff better 'get on board' with disenrollment. Plaintiff was further told, as of April 30, 2020, she needs to resign if she was not going to commit to making the company money and would not participate in the disenrollment and use of Medicare as a primary payer approach of Defendants.

Even under the most liberal pleading standards, we cannot infer from this quote that Defendants' knew Plaintiff was going to report them for fraud. At most, it suggests Defendants were frustrated with Ms. Petre's failure to perform her assigned responsibilities.[2]

Therefore, we find that Plaintiff has failed to state a plausible claim for relief under 31 U.S.C. § 3730(h) and Count III of the Complaint is dismissed without prejudice. Likewise, because the only remaining claims arise out of state law, we decline to exercise supplemental jurisdiction over these claims. *Hall-Wadley v. Maint. Dep't*, 386 F. Supp. 3d 512, 519 (E.D. Pa. 2019). Plaintiff's state law claims for wrongful termination and violation of the Conscientious Employee Protection Act will therefore be dismissed without prejudice as well. Absent a curative amendment to her federal claim, Plaintiff's state law claims, Counts I and II of the Complaint, are remanded to the Superior Court of New Jersey, Camden County Law Division.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is **GRANTED**. An appropriate order follows.

---

[2] As Defendants note, the email Plaintiff sent to Defendants post-termination is not material to the § 3730(h) analysis. At most, it enhances the optics of Plaintiff's case but performs no work from a legal standpoint.

Dated: 3/22/2021                                                              s/ Robert B. Kugler
                                                                                                                        ROBERT B. KUGLER
                                                                                                                        United States District Judge